FILED
2012 Mar-30  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **CAROL J. SEDLACEK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-09-S-2478-NE** |
| | ) | |
| **JOHN M. MCHUGH, Secretary** | ) | |
| **of the Army,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dr. Carol Sedlacek, filed an amended complaint on February 22, 2010, asserting a claim for retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., against her employer, John M. McHugh, in his capacity as Secretary of the United States Army.[1] The case currently is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment.[2] Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that the motion to dismiss is due to be denied, but that the alternative aspect of the motion, seeking summary judgment, is due to be granted.

## I. STANDARDS OF REVIEW

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 24.

## A.        Motion to Dismiss

Federal Rule of Civil Procedure 12(b) permits a party to move to dismiss a complaint for, among other reasons, "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).[3]  This rule must be read together with Rule 8(a), which requires that a pleading contain only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While that  pleading standard does not require "detailed factual allegations," *Bell Atlantic*

---

[3] In full text, Rule 12(b) provides that:

Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

Fed. R. Civ. P. 12(b).

*Corp. v. Twombly*, 550 U.S. 544, 550 (2007), it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. —, 129 S. Ct. 1937, 1949 (2009) (citations omitted).  As the Supreme Court stated in *Iqbal*:

> A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  [*Twombly*, 550 U.S., at 555].  Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."  *Id.*, at 557.
>
> To survive a motion to dismiss founded upon Federal Rule of Civil Procedure 12(b)(6), [for failure to state a claim upon which relief can be granted], a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Id.*, at 570.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  *Ibid.*  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.*, at 557 (brackets omitted).
>
> Two working principles underlie our decision in *Twombly*. *First*, the tenet that a court must accept as true all of the allegations contained in a complaint is *inapplicable to legal conclusions*.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  *Id.*, at 555 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of

discovery for a plaintiff armed with nothing more than conclusions. *Second*, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.*, at 556. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157-158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not "show[n]" — "that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

      In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While *legal conclusions* can provide the framework of a complaint, they must be supported by factual allegations. *When there are well-pleaded factual allegations*, *a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.*

*Iqbal*, 556 U.S. at —, 129 S. Ct. at 1949-50 (emphasis added).

## B.   Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In

making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  Inferences in favor of the non-moving party are not unqualified, however.  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983).  Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    Deficiencies in Plaintiff's Brief

Plaintiff's attorney has completely failed to comprehend his duties in

responding to defendant's motion for summary judgment.[4]    Appendix II to the Uniform Initial Order[5] entered in this case clearly and thoroughly sets forth the requirements for organization and formatting of summary judgment briefs.  With regard to the manner of stating facts, the Appendix states:

**D.    Manner of Stating Facts**

All briefs submitted either in support of or opposition to a motion must begin with a statement of allegedly undisputed relevant material facts set out in *separately numbered paragraphs.*  Counsel must state facts in clear, unambiguous, simple, declarative sentences.    All statements of fact must be supported by specific reference to evidentiary submissions.

**1.    Moving Party's Initial Statement of Facts**

The moving party shall list in *separately numbered paragraphs* each material fact the movant contends is true and not in genuine dispute, and upon which the moving party relies to demonstrate that it is entitled to summary judgment.  Each such statement must be followed by a specific reference to those portions of the evidentiary record that the movant claims supports it.

---

[4] This is but the most significant of many deficiencies in plaintiff's response brief.  Others include recklessly construing case law and failing to appreciate basic rules of grammar, spelling, and punctuation, particularly in the last pages of the brief.  *See, e.g.,* doc. no. 44 (plaintiff's response brief), at 25 ("There exist such a number of implausible, deceptive and contradictory answerers [sic] to why Corlew took the Action [sic] he dis [sic] to render his version unworthy of Credence [sic]."); *id.* ("Corlews [sic] explanation of the reason he denied Plaintiff the change in her work schedule is preposterous."); *id.* ("Corlew contradicts himself when he say's [sic] he doesn't recall Plaintiff asking to use the title of Doctor in Correspondence [sic], not social intercourse."); *id.* at 26 ("The quotes out of mouth [sic] of Corlew condemns [sic] him."); *id.* at 27 ("I hereby certify that I have filed this Response to Defendant's Motion for Summary [presumably, the word "Judgment" should be entered here] with the Court and that the Courts [sic] elecktronicc [sic] system will deliver a copy to Edward Q. Ragland [sic]").  At best, these errors are the result of an egregious failure to proofread.

[5] Doc. no. 15.

### 2.  Opposing Party's Statement of Facts

Each party opposing a summary judgment motion also must submit a statement of facts divided as follows.

### a.  Response to Movant's Statement

The first section must consist of only the non-moving party's disputes, if any, with the moving party's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

### b.  Additional Undisputed Facts

The second section may contain additional, allegedly undisputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The second section of the opposing party's statement of facts, if any, shall be clearly designated as such. The opposing party should include only facts which the opposing party contends are true and not in genuine dispute.

### c.  Additional Disputed Facts

The third section may contain additional, allegedly disputed facts set out in *separately numbered paragraphs* that the opposing party contends require the denial of summary judgment. The third section of the opposing party's statement of facts, if any, shall be clearly designated as such. Each statement of allegedly disputed facts must be followed by specific reference to those portions of the evidentiary record

which both support and contradict the alleged fact.[6]

The Uniform Initial Order also clearly states that any briefs that do not strictly comply with the summary judgment requirements may be stricken.[7]

The "Statement of Undisputed Material Facts" in plaintiff's response brief is not divided into the sections contemplated by the Uniform Initial Order. Specifically, plaintiff did not separately list her disputes with defendant's statement of facts, followed by plaintiff's statement of additional undisputed facts, then plaintiff's statement of additional disputed facts. Instead, plaintiff retyped most, if not all, of defendant's facts, without specifically indicating whether she agrees with or disputes each one. Plaintiff did not even alter or add to many of the factual statements she retyped. The court will assume plaintiff does not have any objection to those statements. The court will also indulge the same assumption for those of defendant's proposed, undisputed facts that plaintiff did not retype. For other of defendant's proposed facts, plaintiff made additions or alterations to defendant's language, but did not call the court's attention to those alterations. Some of those additions and

---

[6] Doc. no. 15 (Uniform Initial Order), at 15-18 (emphasis in original) (footnotes omitted).

[7] *See id.* at 14 ("This exhibit contains specific, mandatory instructions regarding the preparation and submission of briefs and evidentiary materials in support of and in opposition to potentially dispositive motions. **These instructions *must* be followed explicitly. Except for good cause shown, briefs and evidentiary materials that do not conform to the following requirements may be stricken.**"), 18 ("**The court reserves the right *sua sponte* to STRIKE any statements of fact or responsive statements that fail to comply with these requirements.**") (all emphasis in original).

alterations are supported by a citation to the record; others are not. Finally, for still other of the retyped facts from defendant's brief, plaintiff added additional language highlighted in red type face. Again, some of these red-letter additions are supported by a citation to the record; others are not.

There is no explanation for why plaintiff's counsel chose to disregard the court's briefing requirements in favor of the system he appears to have created himself. The court does not appreciate having to spend time adjusting to plaintiff's strange briefing style, and deciphering her method for designating objected and agreed facts. Plaintiff's red-letter additions are more helpful than the additions that are not highlighted in red, due to the simple fact that the court does not have to compare each word of defendant's statement of facts to plaintiff's retyped version of that statement in order to discern any deviations. Even so, many of the red-letter additions are confusingly written or unsupported by record citations. The court has done its best to navigate the maze of facts plaintiff purports to set forth in her brief, but has only included those facts that are actually supported by the record evidence.

Plaintiff's counsel is **strongly cautioned** to pay better attention to briefing requirements (as well as to his case citations, grammar, punctuation, and spelling) in future cases before this court. In the present case, the court has made an exception to its usual policy of strict conformance to those requirements, because defendant's

motion for summary judgment has been pending for several months, and further delaying the case to allow plaintiff's attorney an opportunity to correct his brief would not promote the interests of judicial economy.  *Nota bene*, however:  Counsel will not be so lucky in future cases.  Any future briefs that do not **strictly** comply with the court's requirements will be stricken.

## B.    Factual Findings

### 1.    Plaintiff's educational background

Plaintiff, Carol Sedlacek, received a bachelor's degree in English and Spanish from Jacksonville State University in 1971.  She also received a master's degree in education from the same institution in 1976, and she received a six-year certificate in education, supervision, and curriculum from Jacksonville State on an unspecified date.  She received a E.D.D. degree in education (a doctoral level degree) from the University of Alabama in 1984.[8]

### 2.    Plaintiff's employment history with the Army

Plaintiff has been a civilian employee of the United States Army since 1987.[9] From April 3, 1994 to March 17, 1996, plaintiff held a GS-301 position as a "Program Support Analyst" with the Small Business and Competition Management Office of

---

[8] Doc. no. 25 (defendant's evidentiary submission), Exhibit 1 (Deposition of Carol Sedlacek), at 10-11.

[9] *Id.* at 15.

the United States Army Missile Command at Redstone Arsenal in Huntsville, Alabama.  When plaintiff first became a Program Support Analyst, she was at a Grade Level 11, Step 4.  On September 4, 2004, she was promoted to a Grade Level 12, Step 1, and she was elevated to a Grade Level 12, Step 2 on September 3, 1995.[10]  On March 17, 1996, plaintiff was reclassified to a GS-1102 position as a "Procurement Analyst" with the Small and Disadvantaged Business Utilization Office ("Small Business Office"), still at Redstone Arsenal.[11]  She received a promotion to a Grade Level 13, Step 1 upon her March 17, 1996 reassignment, and she had advanced to a Grade Level 13, Step 7 by January 25, 2004.[12]  As best as the court can discern from the record, employees in "GS-301" job classifications — the original position held by plaintiff from 1994-1996, and, as discussed below, the job classification to which she was involuntarily reassigned in 2004 — performed primarily Program Management and Procurement Functions, and employees in "GS-1102" job classifications performed primarily Contracting functions.[13]  An employee's Grade and Step Level is entirely different from her job classification.  Job classifications dictate the type of tasks an employee will perform; Grade and Step Levels dictate the

---

[10] Defendant's evidentiary submission, Exhibit 71 (Declaration of Leonard J. Farbman), Exhibit 1, at 15-21.

[11] Exhibit 1 to Farbman Declaration, at 15; Sedlacek Deposition, at 18.

[12] Exhibit 1 to Farbman Declaration, at 8-15.

[13] Defendant's evidentiary submission, Exhibit 2 (Deposition of Bob Corlew), at 32-33, 40.

amount the employee will be paid.

Sometime during early 2004, another employee in the Small Business Office physically collided with plaintiff, causing injury to plaintiff's shoulder. Plaintiff complained about that incident; and, on April 15, 2004, in settlement of her complaint, plaintiff was involuntarily reassigned to a GS-301 position as a "Program Specialist" in the Acquisition Center, Business Management Directorate, Support Operations Division, at Redstone Arsenal. Although that reassignment was to a different job classification in a different Division, it still was a lateral move for plaintiff, in the sense that she remained at the same salary level.[14] Following her involuntary transfer, plaintiff continued to receive salary increases. The personnel records submitted as part of the court record reveal that plaintiff's most recent salary level is a Grade 13, Step 9.[15]

At the time of her involuntary reassignment, plaintiff was a member of a union representing federal civilian employees.[16] She filed a grievance with the union about her reassignment, arguing that it was the result of retaliation and gender discrimination, and that it was in violation of the Collective Bargaining Agreement

---

[14] Sedlacek Deposition, at 27, 92; defendant's evidentiary submission, at Exhibit 25 (April 15, 2004 Memorandum of Reassignment).

[15] Exhibit 1 to Farbman Declaration, at 1.

[16] Sedlacek Deposition, at 42-43.

12

governing the relationship between union members and management.[17]   The *union*

denied plaintiff's grievance on May 18, 2005.[18]   Plaintiff appealed to the Equal

Employment Opportunity Commission ("EEOC") Office of Federal Operations, but

her appeal was resolved in favor of the Army on November 16, 2005.[19]   Plaintiff

requested reconsideration of the EEOC's decision, but her request was denied on

January 20, 2006.[20]

The Acquisition Center realigned some of its Divisions in 2005 and, in that

process, combined the separate "Support Operations" and "Analysis" Divisions into

a single "Analysis and Support Division."   Plaintiff was assigned to the newly formed

Analysis and Support Division.[21]   She was the only GS-301 Program Specialist

assigned to that Division.[22]

---

[17] Sedlacek Deposition, at 41, 70, 92-93; defendant's evidentiary submission, at Exhibit 26 (documents related to plaintiff's union grievance).   The Collective Bargaining Agreement allowed covered employees to raise discrimination claims through either the negotiated grievance procedure set forth in the agreement, or through the usual Equal Employment Opportunity office procedures. *See* defendant's evidentiary submission, Exhibit 66 (Collective Bargaining Agreement), at Article 51, Section 2.

[18] Defendant's evidentiary submission, Exhibit 26, at 6-7.

[19] Defendant's evidentiary submission, at Exhibit 27 (EEOC decision).

[20] Defendant's evidentiary submission, at Exhibit 28 (denial of reconsideration).

[21] Defendant's evidentiary submission, Exhibit 2 (Deposition of Bob Corlew), at 15; defendant's evidentiary submission, Exhibit 3 (May 16, 2007 Transcript of Department of Defense Civilian Personnel Management Service Investigations and Resolutions Division Fact-Finding Conference in the Complaint of Dr. Carol Sedlacek, Agency Docket No. ARREDSTON06NOV04902) ("May 16, 2007 Transcript"), at 19-20.

[22] Defendant's evidentiary submission, Exhibit 6 (March 4, 2009 Transcript of Department of Defense Civilian Personnel Management Service Investigations and Resolutions Division

### 3.    Plaintiff's supervisors

Until May of 2009, plaintiff's first-line supervisor in the Analysis and Support Division was Robert Corlew, the Division Chief.[23]   Corlew was not in plaintiff's chain of command prior to October of 2005, and he was not involved with either her involuntary reassignment in 2004, or her subsequent grievance.[24]   Between May of 2006 and June of 2007, plaintiff's second-line supervisor was Lieutenant Colonel Phillip Deaton, who served as Director of the Business Management Office.[25] Between March of 2008 and July of 2010, plaintiff's second-line supervisor was Mr. Charles Farrior, the Director of the Business Management Directorate.[26]   At all relevant times, plaintiff's third-line supervisor was Ms. Marlene Cruze, the Executive Director of the Acquisition Center at the Army's Aviation and Missile Command ("AMCOM").[27]   Colonel Kallam was the Deputy Executive Director of the Acquisition Center.  He apparently was not in plaintiff's direct chain of command, but

---

Investigation in the Complaint of Dr. Carol Sedlacek, Agency Docket Number ARREDSTON08AUG03551) ("March 4, 2009 Transcript"), at 135.

[23] Corlew Deposition, at 13; Sedlacek Deposition, at 28.

[24] Sedlacek Deposition, at 66.

[25] May 16, 2007 Transcript, at 207.

[26] March 4, 2009 Transcript, at 160-61.

[27] Defendant's evidentiary submission, Exhibit 4 (Transcript of March 11, 2008 EEOC hearing, Volume 1) ("March 11, 2008 Transcript, Vol. 1"), at 149; defendant's evidentiary submission, Exhibit 5 (Transcript of March 11, 2008 EEOC Hearing, Volume 2) ("March 11, 2008 Transcript, Vol. 2"), at 264.

plaintiff sometimes addressed issues to him that might otherwise have been addressed to Ms. Cruze.  The Analysis and Support Division was a sub-unit of the Business Management Directorate, which was a sub-unit of AMCOM.

### 4.    Plaintiff's work assignments in the Analysis and Support Division

Employees in the Analysis and Support Division performed a variety of tasks to support the work of other organizations.  Those tasks included budgeting, financial management, and personnel management.  None of the employees in the Analysis and Support Division had active warrants that would enable them to bind the United States in soliciting, negotiating, and awarding contracts.  Even so, most of the employees performed tasks to support existing contracts, including compiling statistics, gathering data, and providing operations summaries to higher management.[28]

All employees of the Analysis and Support Division, except for plaintiff, were assigned to the GS-1102 job series.  Most of those employees held a Level 2 or Level 3 certification in Contracting.[29]  Plaintiff had a Level 3 certification in Program Management, but she did not have any level of certification in Contracting functions, despite having taken several of the classes that would be required for a Level 1

---

[28] Corlew Deposition, at 24-32.

[29] *Id.* at 28-39; May 16, 2007 Transcript, at 185.

Contracting certification.[30]   Corlew testified that, due to her lack of Contracting certification, plaintiff was not qualified to perform many of the tasks usually performed by other employees in the Analysis and Support Division.[31]   To further complicate matters, no Program Management functions (for which plaintiff would have been qualified) were performed by the Support and Analysis Division.[32]   Thus, as Corlew testified, plaintiff was "misassigned" to the Support and Analysis Division, and it was difficult for him to assign her tasks on a daily basis.[33]   Corlew never actively sought to have plaintiff's job classification changed from a GS-301 to a GS-1102 after she was reassigned to the Analysis and Support Division.[34]   Plaintiff, however, sought either reassignment to a different Division or reclassification to the GS-1102 job series on several occasions, but her attempts apparently were not successful.   There is no evidence that Corlew ever interfered, either directly or indirectly, with any of plaintiff's attempts to be reassigned or reclassified.

### 5.   Plaintiff's informal complaints and union grievances

While she was employed in the Analysis and Support Division under Corlew's

---

[30] Sedlacek Deposition, at 31-33, 36, 188-89.   Plaintiff chose to pursue the Program Management route instead of the Contracting route because she thought it would be better for her career.   *Id.*

[31] Corlew Deposition, at 32-33.

[32] *Id.* at 40.

[33] May 16, 2007 Transcript, at 185.

[34] Sedlacek Deposition, at 66; Corlew Deposition, at 32.

supervision, plaintiff lodged numerous informal complaints and/or union grievances about various aspects of her work assignments and general working environment.

### a.    Work assignments

On October 31, 2005, soon after becoming plaintiff's supervisor, Corlew informed plaintiff that, in order to put her education credentials to better use, he was assigning her to work with Steve Froniabarger on the task of editing and creating *The Advocate,* a quarterly publication of the Acquisition Support Center.  Corlew also informed plaintiff that he was exploring the possibility of assigning her to assist with course preparation and presentations for the Acquisition Center University, an entity that provided training to employees.  Plaintiff responded that she did not want to work at the Acquisition Center University because she had sought employment in the federal service to avoid teaching.  She also stated, with regard to working on *The Advocate,* "writing 6th grade articles and proofreading were not of interest since I have been publishing in international and national publications."  She expressed an interest in performing more "high-level work to include analytical and program work."  Corlew reviewed plaintiff's job description and consulted with the Management Employee Relations Board ("MER"). On November 16, 2005, he informed plaintiff that, despite her lack of interest in the task, the work on *The Advocate* was within her job description, and she still would be required to perform

17

it.  That same day, plaintiff complained by e-mail to Vicki Fuller and Kitty Williams,

two union representatives, that the *The Advocate* assignment was below her grade,

and that she should not be required to report to Froniaberger, who was a GS-12, one

grade level lower than her own.  Plaintiff requested that she be reclassified back to

the GS-1102 job series, and complained that she had only been made a GS-301 "so

that they could dump junk job[s] like this on me."[35]  After receiving plaintiff's e-mail,

on November 17, 2005, Ms. Williams sent Corlew a message informing him that his

responses to plaintiff's complaints had been "great."[36]

Sometime in April of 2006, plaintiff was assigned to work with Robert Lucas,

the Chief of the Policy Division and the Acting Director of the Acquisition Center

Business Management Office, on a Contract Management Report ("CMR") project.

Corlew described that task as follows:

> You would send proposed changes, new developments in the
> Contract Management Report area and attach them with e-mails and
> pass them on to other agencies outside of the Acquisition Center. And,
> you would receive their feedback and put it together, organize it and put
> it in a form that could be reviewed by the Policy Chief and passed
> forward.[37]

Plaintiff complained to Corlew, in an e-mail dated May 1, 2006, that the task was too

---

[35] Defendant's evidentiary submission, Exhibit 37 (e-mails), at 1-2.

[36] *Id.* at 1.

[37] May 16, 2007 Transcript, at 187-88.

18

administrative in nature, that she did not work for Lucas, and that she should not have to "learn Army correspondence rules."  By her last comment, plaintiff meant that she did not have, and did not want to gain, a fully operational knowledge of the Army's e-mail system.  She and Corlew exchanged several more e-mails about the subject later that same day.  Corlew responded that Lucas had the authority to delegate the CMR  task, and that he, as her direct supervisor, would expect her to complete the task.  Corlew also explained that e-mail had become the preferred method of communication within Army civilian organizations, and he encouraged plaintiff to familiarize herself with the technology that would be necessary to complete the CMR task.  When plaintiff reiterated that she did not like the administrative nature of the tasks, that she thought Lucas could perform the task himself, and that she lacked the computer skills to perform the task, Corlew insisted that she would be required to complete the task, and suggested that she would be subject to disciplinary action if she failed to do so.  Despite Corlew's warning, plaintiff apparently attempted to delegate the CMR task to a clerical employee.  Corlew admonished her for doing so, and reminded her to have the task completed within two days.[38]

On August 10, 2006, plaintiff sent Corlew an e-mail with the message title

---

[38] *Id.*; *see also* defendant's evidentiary submission, Exhibit 37 (e-mails), at 5-8.  *See id.* at 8 (May 1, 2006 e-mail from Corlew to plaintiff) ("Carol, you do not complete a task by handing it off to someone else.").

"Getting on the right track." She stated that she had spoken with Colonel Kallam about finding a more appropriate job for her qualifications. In the meantime, she asked Corlew to assign her tasks "that are consistent with my grade level and position description." She informed Corlew that she was waiting to receive editing jobs for *The Advocate,* but she would only complete those assignments if they came directly from him, not from Froniaberger. Plaintiff also informed Corlew that she planned to take the computer courses he had suggested.[39] Corlew responded, later that same day, that she should contact Froniaberger for her assignments on *The Advocate*. He also reminded her of other assignments that she had not completed (*e.g.,* the CMR task), and a new assignment to manage Foreign Military Sales ("FMS") cases. Corlew asked for a description of plaintiff's current computer skills and a list of classes in which she desired to enroll. He remarked that she should already have a high level of knowledge in computers, given her educational background and work experience.[40]

### b.    Other complaints

Plaintiff complained to Colonel Kallam on August 3, 2006, that Colonel Denton had spoken disrespectfully to her.[41]

On October 31, 2006, plaintiff requested to have a union representative present

---

[39] *Id.* at 4.

[40] *Id.* at 9, 21.

[41] *Id.* at 5.

during her performance evaluation with Corlew.  She made that request because Corlew had asked another female employee within the Analysis and Support Division to be present during the evaluation.  Corlew refused plaintiff's request, because the MER office had informed him that union representatives were not allowed to be present during performance evaluations.  Plaintiff refused to meet without a union witness present, so she received her performance evaluation later than other employees.  The following day, plaintiff reported that situation to Marlene Cruze, who suggested setting up a meeting that included plaintiff, Corlew, and Ms. Cruze.[42]

On December 7, 2006, Corlew sent plaintiff an e-mail stating that he had observed her coming into the office late, and reminding her that she needed to present a leave slip anytime she is late.  An e-mail exchange ensued throughout the remainder of that day.  Plaintiff denied being late, and reported to Vicki Fuller, the union attorney, that Corlew had been making up lies about her.  She stated, "This has gotten real scary.  I need to be reassigned immediately," and "[I]t's downright dangerous now with him telling lies about me and to me and not giving me credit for doing his taskers."[43]  At Fuller's suggestion, plaintiff requested Marlene Cruze to reassign her to another position.  In her December 7, 2006 e-mail to Cruze, plaintiff stated

---

[42] *Id.* at 6-9.

[43] Apparently Army employees sometimes refer to work assignments as "taskers."

Based on Corlew's latest of action of lying and saying that he saw
me come in late when I didn't, and luckily had a witness who
remembered when he checked with her, please let me change the date on
the reassignment letter you gave me Feb 05 to go work with Rex
[Conners] or I'll write another one.  I'm scared of him.  He is dangerous.
There seems to be no end to his harassment.

Cruze forwarded the message to Deaton and asked for advice on how to handle the

escalating situation.[44]  The record does not reflect what, if anything, Deaton did in

response.

### c.    Training

Plaintiff requested to attend a Defense Acquisition Executive Overview

Workshop in February of 2006, but her request was denied.  When she asked Corlew

why it had been denied, he responded that there was not enough money in the budget

to fund it.  But when plaintiff followed up by asking an employee in the Budget

Office about the situation, that employee told her that there was enough money to

fund the training, and that all training denial decisions had been made by the

supervisors.[45]

In April of 2006, plaintiff requested to attend the World Congress, a one-day

Acquisition course in Atlanta, Georgia.  Corlew denied the request at the direction of

Colonel Deaton, because there was not enough money in the budget.  Plaintiff

---

[44] Defendant's evidentiary submission, Exhibit 37 (e-mails), at 11-15.
[45] May 16, 2007 Transcript, at 40-49.

22

acknowledged that no one else from her Division was permitted to attend the World Congress.[46]  She was aware of four other employees who were approved for training during her employment in the Analysis and Support Division, but she did not state the employees' names, the nature of the training, or the dates of their training in the record.[47]

In August of 2006, plaintiff requested to participate in a validation course for the Army's Civilian Education System.  Each Directorate within AMCOM was expected to select two candidates to perform an audit of the course and provide feedback before the system became fully operational.  Plaintiff was selected to participate in the Foundation level of the course.  The target audience of the Foundation course was "all newly employed Department of the Army Civilians hired within the last 6 months, grades GS-1 thru GS-15, to include former military, and transfers from other government agencies."[48]  Plaintiff complained to Corlew because she wanted to be selected for the Advanced level of the course instead.  Her request to attend the Advanced course was denied because the target audience of the Advanced course was "Army civilian leaders who exercise predominately indirect supervision (second level or above supervision), [and] military supervisors of civilian

---

[46] *Id.* at 50-58.

[47] *Id.* at 56-57.

[48] Defendant's evidentiary submission, Exhibit 40 (e-mails), at 4.

employees," and plaintiff did not fit that description. Although there apparently were "Basic" and "Intermediate" level courses between the "Foundation" and "Advanced" levels, those classes were not among the ones being validated during August of 2006.[49]

Also in August of 2006, Corlew asked plaintiff to create a spreadsheet, but she responded that she could not do so because she lacked the necessary computer skills in Microsoft Excel. It also became apparent that plaintiff lacked the ability to use Power Point and Microsoft Word, and that she could not cut and paste e-mails. Plaintiff asked Corlew if she could receive training on those programs. Corlew was surprised that plaintiff did not already possess those computer skills, but he never gave plaintiff a list of classes he wanted her to take, and plaintiff never took any classes. In May of 2007, when Corlew realized that plaintiff still did not know how to operate those programs, he instructed plaintiff on how to sign up for online training classes. He also brought her books on Microsoft Word and Excel, and promised to bring her another book on Power Point. He suggested that she spend an hour or so each day on learning how to operate those programs.[50] Plaintiff responded by complaining to Corlew in a May 15, 2007 e-mail (copied to Colonel Deaton and

---

[49] May 16, 2007 Transcript, at 210-11; defendant's evidentiary submission, Exhibit 40 (e-mails), at 1-7.

[50] May 16, 2007 Transcript, at 58-65; *see also* defendant's evidentiary submission, Exhibit 40 (e-mails), at 8-12.

various union representatives) that she should have been sent to formal training courses on those computer programs, instead of being given books to read.[51]

Plaintiff acknowledges that she was allowed to attend certain other training courses in 2006 and 2007, but the record does not specify any details about those courses.[52]  Corlew testified that plaintiff was not qualified to perform many of the tasks required of her position, but he nonetheless acknowledged that he had never actively pursued sending her to any training courses.  Even so, it seems apparent from the record that it is not normal procedure for a supervisor to arrange training classes for employees; instead, the employees decide what training they want or need, and then they request permission to take those courses from their supervisors.[53]

### d.    Surveillance

Plaintiff asserts that Corlew instructed two junior employees to "watch" her. On a date not clearly specified by the portions of the record cited by the parties, Frank Fisher, a GS-12 employee, began training plaintiff to take over certain tasks related to FMS, which was a new project for plaintiff.  Corlew instructed Fisher to continue to "maintain surveillance" over plaintiff even after she completed training and took over the project, to ensure that she performed the required tasks correctly and in a

---

[51] *Id.* at 8.

[52] Sedlacek Deposition, at 142-44; March 11, 2008 Transcript, Vol. 2, at 305-12.

[53] Corlew Deposition, at 32-37.

25

timely manner.  Corlew also repeatedly asked Steven Froniabarger, the editor of *The Advocate* and a GS-12, about the quality and quantity of plaintiff's work on that publication.  Plaintiff maintains that there was no need for Corlew to learn about her performance from other employees, because she provided him with weekly performance updates.[54]

### e.    Greeting card

Plaintiff was on medical leave for approximately two and a half months beginning in May of 2006.  While plaintiff was out, Arlene Dussault, another employee in plaintiff's division, asked Corlew if the office planned to do anything encouraging for plaintiff, like send a card or flowers.  Corlew said he would take care of it, but plaintiff never received a card from the office as a whole.[55]  When plaintiff returned to work, she learned that her co-workers had attempted to send her an "office card," but it was returned because it had been incorrectly addressed.  Plaintiff complained that Dussault simply handed her the card, which was dirty from being in the return mail.  She also complained that the card was less expensive and of poorer quality than the cards sent to other sick or injured co-workers in the past.[56]

---

[54] May 16, 2007 Transcript, at 136-49; Sedlacek Deposition, at 49.  Corlew disputes this, but at the summary judgment stage, all facts must be construed in the light most favorable to plaintiff, the non-moving party.

[55] Plaintiff did receive cards from several individual co-workers, but never from entire office. May 16, 2007 Transcript, at 76.

[56] *Id.* at 75-85.

###### f.      Requested schedule change

In 2006, plaintiff worked four ten-hour shifts each week, for a total of forty hours a week.  She normally worked Monday through Thursday, which were the days of the week specified in the portion of her union's collective bargaining agreement that allowed the alternate "10/4" work schedule. On July 19, 2006, plaintiff requested that her day off be switched to Monday, so she could spend more time with her husband, who worked in Anniston, Alabama, approximately one and a half to two hours away, and who also had Mondays off.  The union representative handling plaintiff's request initially responded that plaintiff could make the switch, and Corlew therefore initially approved the request.  Soon thereafter, however, Corlew discovered that the union representative's initial response was incorrect, and that it would be a violation of the collective bargaining agreement to allow plaintiff to take Mondays off.  Consequently, Corlew ended up denying plaintiff's request.[57]

Subsequently, plaintiff and Corlew exchanged a series of e-mails.  On August 1, 2006, plaintiff requested Corlew to reconsider his denial decision, arguing that, even though her request to change days off was inconsistent with the explicit language of the collective bargaining agreement, it was supported by the Preamble

---

[57] *Id.* at 85-90; March 11, 2008 Transcript, Vol. 2, at 291-92; defendant's evidentiary submission, Exhibit 66 (Collective Bargaining Agreement), at Article 17, Section 9(b).  *See also* defendant's evidentiary submission, Exhibit 42 (July 19, 2006 e-mail from plaintiff to Corlew, requesting the schedule change).

to that agreement, which stated that one primary purpose of the agreement was to promote the "well-being, dignity, and respect" of union member employees.  Corlew upheld his denial decision that same day, and plaintiff responded within the hour, stating:

> I am not military and it's impractical for you to take this stand and not accommodate me. . . .  You are not promoting nor improving the efficient administration of the Federal Service nor my well-being, dignity and respect for me as the Agreement says you're supposed to do by denying my request.[58]

Corlew responded on August 2, 2006, stating:

> Carol, this is an unethical request.  It is unethical to expect special treatment by pushing for privileges that are outside of the Management/Union Negotiated Agreement.  What you are asking me to do is unethical and if I agreed to it I would be violating the rights of the rest of the members of the bargaining group who are covered by this agreement.  You are putting your own personal wishes above your fellow union members.  Although I am not a union member, I fully respect their right to bargain collectively for the rights of their membership.  I can not agree to such a selfish request in contravention to the Management/Union Negotiated Agreement.[59]

Plaintiff responded two hours later, stating:

> It is not an unethical request!  You are very much out-of-line to say that.  As I said, I interpret the Preamble to say the Agreement is a guide and the intent and purpose is to promote the well being, dignity and respect for employees.  I have talked to several employees and other supervisors about this and none of them think it is selfish or unethical

---

[58] Defendant's evidentiary submission, Exhibit 43 (e-mails), at 9.

[59] *Id.*

28

of me to request to work the same schedule as my husband.  Nobody else cares what day I'm off.  They see the importance of having the time together.

Your overreactions to human behaviors of the people in here has caused you to have the reputation of being a very insensitive manager.[60]

As a result of that e-mail, Corlew issued plaintiff a "Letter of Counseling" on August 7, 2006, stating:

1.   The purpose of this memo is to advise you that I deem the remarks in your attached email message (below) to me dated 2 Aug 06 stating that "Your overreactions to human behaviors of the people in here has caused you to have the reputation of being a very insensitive manager." , "You are very much out-of-line to say that." and "I am not military and it's impractical for you to take this stand and not accommodate me[,]" as disrespectful, discourteous and argumentative.

2.   Email messages or comments directed to a Supervisor or Director will not contain disrespectful, discourteous, insulting or argumentative dialog.   Employees   are   required   to   be respectful/courteous towards both managers and co-workers.  Failure to follow this directive may result in disciplinary action based on a charge of Disrespectful/Discourteous Conduct.

3. For a first offense, "Disrespectful/Discourteous Charge" would carry a penalty ranging from a written reprimand to a 1-day suspension. For a second offense the penalty could range to a five day suspension.[61]

Plaintiff also sent an e-mail to Colonel Deaton on August 1, 2006, complaining of the decision to deny her request to change work schedules, and stating that she

---

[60] *Id.*

[61] Defendant's evidentiary submission, at Exhibit 45 (August 7, 2006 Letter of Counseling).

believed the request was in accordance with the preamble to the collective bargaining agreement.  She told Colonel Deaton, "I had hoped you would be a change-master and a clear thinker."[62]  As a result of that statement, Colonel Deaton also sent plaintiff a "Letter of Counseling" on August 2, 2006.  His letter identified plaintiff's statement, "I had hoped you would be a change-master and a clear thinker" as "disrespectful and discourteous," and informed plaintiff of the potential disciplinary consequences of disrespectful and discourteous behavior.[63]

### g.    Performance evaluations

On October 30, 2006, plaintiff received her performance evaluation for the 2005-2006 fiscal year, which was signed by Corlew and Colonel Deaton.  She received an overall rating of "fair," which was a level 4 on a scale of 1 to 5, with 1 being the highest possible rating.[64]  Plaintiff filed a grievance with the union about the evaluation, and that resulted in her performance rating being raised, but it is not clear from the record what new rating level plaintiff was assigned.[65]

Plaintiff also complained to the union about her performance evaluation for the

---

[62] Defendant's evidentiary submission, Exhibit 43 (e-mails), at 6.

[63] Defendant's evidentiary submission, at Exhibit 44 (August 2, 2006 Letter of Counseling).

[64] Defendant's evidentiary submission, at Exhibit 29 (October 30, 2006 Performance Evaluation).

[65] Sedlacek Deposition, at 125-26, 137-38; defendant's evidentiary submission, at Exhibit 31 (documents related to the grievance).

2007-2008 fiscal year (which plaintiff received on October 23, 2008), and, on November 18, 2008, Charles Farrior, who by that time had replaced Colonel Deaton as Corlew's immediate supervisor, changed her overall rating from a 2 to a 1.[66] Even after her rating was elevated, however, Farrior refused to give plaintiff a cash award because Corlew had not recommended her for one, and Farrior saw no compelling reason to override Corlew's decision.[67]   Army civilian regulations provide that employees receiving an overall rating of "3" or higher are eligible to be *considered for* performance-based cash awards.  "Supervisors should grant such awards to those who are deserving based on merit and whether the employees have been otherwise rewarded for their contributions."[68]  The regulations also state that such awards are "given in recognition of high level performance significantly above that ordinarily found in the concerned position."[69]

### h.    Acting chief assignments

A supervisor, such as Corlew, typically appoints another employee within his Division to serve as Acting Chief anytime the supervisor will be absent from work.

---

[66] Defendant's evidentiary submission, at Exhibits 32 & 33.

[67] Defendant's evidentiary submission, at Exhibit 13.

[68] Defendant's evidentiary submission, Exhibit 61 (Redstone Arsenal Regulation 690-10), at 14.

[69] Defendant's evidentiary submission, Exhibit 61 (Redstone Arsenal Regulation 690-16), at 14.

31

Corlew testified that he generally chose an employee who could answer the most questions and handle the most situations during his absence. That usually meant that the employee chosen would have a high level of certification in Contracting. Corlew stated that he generally did not choose plaintiff because she did not hold any level of certification in Contracting.[70] During his tenure as Director of the Analysis and Support Division, Corlew assigned several different individuals — both male and female — to serve as Acting Chief during various short absences.[71] On March 28, 2006, plaintiff sent Corlew an e-mail message asking why she was not being given the opportunity to serve as Acting Chief like other employees had.[72] Corlew responded, "Carol, no problem — I will try to remember to let you serve as Acting the next time I have to be out of the office."[73] Despite that statement, Corlew still did not appoint plaintiff as Acting Chief. On October 23, 2006, after another employee had received the temporary appointment, plaintiff sent an e-mail message to Marlene Cruze, complaining that she did not receive the appointment and asking whether Corlew's actions constituted harassment and discrimination.[74] Cruze forwarded the

---

[70] Corlew Deposition, at 162-64.

[71] *See* defendant's evidentiary submission, Exhibits 46-47 (e-mails appointing various individuals as Acting Chief).

[72] Defendant's evidentiary submission, Exhibit 46, at 5.

[73] *Id.* at 6.

[74] *Id.* at 2.

message to Corlew, and the following day, after consulting with MER, Corlew advised plaintiff that he had confirmed that he had the discretion to appoint anyone he wanted to serve as Acting Chief.[75]  Plaintiff responded with the following message, and copied Ms. Cruze:

> I didn't question your right to appoint anyone you wish.  I asked you why I haven't been appointed acting like the other 13s and a 12.  In the 3-28 e-mail you stated that you would try to remember to do so.  I am puzzled with why you haven't.  That is my question.  I would like an answer from you on this rather than have to go to another entity, if possible.[76]

Corlew replied to plaintiff a few hours later, stating, "I used my managerial prerogative of appointing the person that is best qualified to stand-in for me.  I considered you but you are not as knowledgeable in Procurement or Budgeting.  My judgment is based on whom I believe to be best qualified out of the available candidates."  He also advised plaintiff to follow the proper chain of command when lodging future complaints.  Specifically, he instructed her to notify his immediate supervisor, Colonel Deaton, whenever she had a complaint about him, and to avoid involving Ms. Cruze, the Executive Director, unless all other avenues had been exhausted.[77]

---

[75] *Id.* at 1.

[76] *Id.*

[77] *Id.*

Eventually, in February of 2009, Corlew did ask plaintiff to serve as Acting Chief during an upcoming one-day absence.[78]  Corlew testified that Farrior directed him to give plaintiff the appointment in order to keep her happy and hopefully prevent her from filing a grievance.[79]

### i.    Being called "Dr. Sedlacek"

On April 6, 2006, all the members of the Analysis and Support Division were asked in an e-mail to verify the accuracy of their contact information for inclusion in a telephone directory.  Plaintiff responded that if the military Colonels were to be designated with their rank, she also should be listed with her honorarium "Doctor," in recognition of her E.D.D. in Education.  Plaintiff also stated that "all other AMCOM organizations" recognize their employees' doctoral titles in telephone listings.  Corlew forwarded plaintiff's e-mail request to his supervisor, Colonel Kallam, and stated:

> I guess Ms. Sedlacek is bored and wants to try to get some trouble going again. (see her note below to Katie Clark).
>
> I advised Katie to just ignore it and not respond.
>
> I also intend to ignore it but the sheer gall of this lady never ceases to astound me.  Her PhD should only be recognized in an

---

[78] Defendant's evidentiary submission, at Exhibit 48 ("Carol, if you are available are you willing to serve as acting Division Chief next Tuesday the 17th??").

[79] Corlew Deposition, at 166-67.

academic environment.[80]

Plaintiff also asked Corlew on several other unidentified occasions to refer to her as "Dr. Sedlacek" instead of "Carol" or "Ms. Sedlacek" on written correspondence that was sent outside their division.  Corlew preferred to address employees under his supervision by their first names in order to maintain an informal working environment, but he did not explain why he did not address plaintiff as "Dr. Sedlacek" to others outside their Division.[81]

### j.      Name placement on e-mail chains

On November 30, 2006, plaintiff sent Colonel Deaton an e-mail stating, "I am offended by Corlew's consistent actions of listing me last in his e-mails to the public."  To support that complaint, she forwarded Colonel Deaton an e-mail that Corlew had sent on November 8, 2006, which, indeed, had plaintiff's name listed last among all recipients.  It is not entirely clear from the record, but it appears that the e-mail was sent only to employees under Corlew's supervision, as the e-mail consisted simply of a request for the employees to submit weekly updates to him.  Deaton responded by stating, "I don't believe this should be an issue of concern/offense.  To me, as long as all employees receive the same information, the order in which their

---

[80] Defendant's evidentiary submission, at Exhibit 56.
[81] May 16, 2007 Transcript, at 125-35; Corlew Deposition, at 77-78.

addresses are listed in the address header is immaterial."[82]

Corlew testified that he does not pay any attention to the order in which names are listed on e-mails, and that the e-mail system automatically lists people's names in alphabetical order.[83]   Plaintiff disputes that names were listed on e-mails in alphabetical order, and, indeed, the message about which plaintiff complained to Colonel Deaton on November 30, 2006 did not have names listed in alphabetical order.[84]   Even so, it is undisputed that, after plaintiff complained, Corlew began listing plaintiff's name earlier in the order on group e-mails.[85]

### k.    Access to plaintiff's cubicle

Plaintiff testified that, after she had been moved to a work area where hers was the only desk, someone stole a nice notebook and pen from her desk.   She subsequently began moving a chair to the entrance of her cubicle each day when she left work in order to block access to her desk.   Corlew accused plaintiff of barricading herself in her cubicle and asked plaintiff to remove the chair because it was a fire hazard, but she refused.   Two fire marshals came to plaintiff's office to investigate, but they did not discover any violations.   The dates of these events are not clear from

---

[82] Defendant's evidentiary submission, at Exhibit 57.

[83] May 16, 2007 Transcript, at 156-63.

[84] *See id.*; *see also* defendant's evidentiary submission, at Exhibit 57.

[85] May 16, 2007 Transcript, at 162-63.

the record.[86]

### l. Identification of plaintiff's position as eligible for early retirement

On July 24, 2008, Corlew sent plaintiff an e-mail informing her that her position had been identified as eligible for Voluntary Early Retirement ("VERA") and Voluntary Early Separation Incentive Pay ("VSIP").  The VERA and VSIP programs provided financial incentives for employees who chose to retire or resign early.[87] Plaintiff testified that identification of a position as eligible for VERA and/or VSIP was an indication that the position might be eliminated or restructured, and she was embarrassed and humiliated to have her position so identified.  Even so, she did not dispute that she was eligible for the early retirement programs.  Plaintiff did not exercise the option to take VERA and/or VSIP, and her position was not eliminated.[88]

### m. Corlew's retirement luncheon

Corlew retired in May of 2009, and the Support and Analysis Division held a retirement luncheon for him.  Employees were permitted to attend the luncheon without using accrued leave.  During the luncheon, Corlew granted everyone in the Division "59 Minutes," which meant that they were allowed to leave 59 minutes early

---

[86] Sedlacek Deposition, at 50, 85-90.

[87] Defendant's evidentiary submission, at Exhibit 52.

[88] Sedlacek Deposition, at 139-41.

that day without using any of their accrued leave.  Plaintiff did not attend the

luncheon, and she did not learn about the "59 Minutes" until her co-workers started

leaving early that afternoon.  Plaintiff did not leave early that day, but she later

complained by e-mail to Farrior that she had not received 59 minutes off the day of

the luncheon.  Farrior responded within a week, informing plaintiff that she was free

to take the 59 minutes at any later time she chose.  Plaintiff did later take the 59

minutes of time off.[89]

### 6.   Plaintiff's formal EEO complaints

Plaintiff first made contact with the Equal Employment Opportunity ("EEO")

office at Redstone Arsenal on November 27, 2006.  She filed a formal complaint of

discrimination on March 7, 2007, alleging discrimination on the basis of sex, age, and

reprisal/retaliation for prior EEO activity, and her complaint was assigned number

ARREDSTON06NOV04902.   More specifically, plaintiff complained of being

worked outside her grade, not being selected for two higher positions, and being

subjected to harassment.   The alleged harassment included the following: (1)

receiving Letters of Counseling from Colonel Deaton and Corlew; (2) not being

designated Acting Chief; (3) being denied training opportunities; (4) receiving an

---

[89] Sedlacek Deposition, at 186-87; defendant's evidentiary submission, Exhibit 7 (June 10, 2009 Transcript of Department of Defense Civilian Personnel Management Service Investigations and Resolutions Division Fact-Finding Conference in the Complaint of Dr. Carol Sedlacek, Agency Docket No. ARREDSTON09FEB00424) ("June 10, 2009 Transcript"), at 111-114.

inexpensive card in a dirty envelope upon her return from sick leave; (5) not being referred to as "Dr. Sedlacek"; (6) being accused of barricading herself in her cubicle; (7) hearing Colonel Deaton question whether she was up to participating in the Contracting Intern Program; (8) not being allowed to have a representative present during her performance appraisal, and receiving her final appraisal later than other employees; (9) having her work "watched" by other, lower-grade employees; (10) being listed last on e-mails; (11) Corlew lying about her coming into work late and not doing her work; (12) receiving unjustified negative evaluations of her performance; (13) involuntary reassignment to the Analysis and Support Division; and (14) unspecified additional "irrational hostility" by Corlew and Deaton because of plaintiff's gender.[90]  After a hearing, the EEOC Administrative Judge assigned to plaintiff's complaint found that plaintiff had not been the victim of discrimination.[91] That decision became a final action of the Department of the Army on July 10, 2008.[92]  Plaintiff filed an appeal of the Army's decision with the U.S. Equal Employment Opportunity Commission Office of Federal Operations ("OFO") on July

---

[90] Defendant's evidentiary submission, at Exhibit 8 (March 7, 2007 Formal Complaint of Discrimination).

[91] Defendant's evidentiary submission, at Exhibit 16 (Hearing Decision in ARREDSTON06NOV04902).

[92] *See* defendant's evidentiary submission, at Exhibits 17 & 18.

29, 2008.[93]  The OFO entered an order affirming the Administrative Judge's decision

on May 11, 2010.[94]

Plaintiff filed a second formal complaint of discrimination with the Redstone

Arsenal EEO Office on October 30, 2008.  The second complaint was assigned

number ARREDSTON08AUG03551, and, like plaintiff's first complaint, it alleged

discrimination on the basis of sex, age, and reprisal.  First, plaintiff complained that

Corlew had notified her that her position was eligible for VERA/VSIP, which

indicated that the position might be eliminated.  Second, she complained that Corlew

had not selected her to serve as Acting Chief during his absences on September 9 and

18, 2008.  Third, she complained that Corlew failed to comply with the applicable

collective bargaining agreement by failing to meet with her the required number of

times prior to giving her performance evaluation.  Finally, she complained that

Corlew chastised her in an e-mail dated September 16, 2008, for not inviting him to

a meeting.[95]  The Department of the Army issued a final agency decision on

September 10, 2009, finding no discrimination.[96]

---

[93] *See* defendant's evidentiary submission, at Exhibit 19 (letter from the OFO acknowledging receipt of plaintiff's complaint).

[94] Defendant's evidentiary submission, at Exhibit 20.

[95] Defendant's evidentiary submission, at Exhibit 10 (Formal Complaint of Discrimination in ARREDSTON08AUG03551).

[96] Defendant's evidentiary submission, at Exhibit 21 (Final Agency Decision in ARREDSTON08AUG03551).

Plaintiff filed a third formal complaint of discrimination with the Redstone Arsenal EEO Office on March 12, 2009.  The complaint was assigned number ARREDSTON09FEB00424, and it again listed complaints of discrimination on the basis of gender, age, and reprisal.  Specifically, plaintiff complained that she received a low rating on her 2008 performance appraisal and that, even after the rating had been elevated, she did not receive a bonus award.  She also complained that Corlew informed her by e-mail on February 2, 2009 that it was time to conduct a quarterly review of her performance and accomplishments, but he did not conduct similar meetings with other employees.  Third, plaintiff complained that Corlew sent her an e-mail on February 20, 2009, wrongfully stating that the quarterly review had taken place.  Finally, plaintiff complained that her 2008 performance appraisal was not processed in a timely manner.[97]  Plaintiff amended her complaint on May 20, 2009, to complain that she was not granted as much leave as other employees on the date of Corlew's retirement luncheon.[98]  The Department of the Army issued a Final Agency Decision on December 17, 2009, finding no discrimination.[99]

## III. DISCUSSION

[97] Defendant's evidentiary submission, at Exhibit 13 (Formal Complaint of Discrimination in ARREDSTON09FEB00424.

[98] *See* defendant's evidentiary submission, at Exhibit 15 (Acceptance of Discrimination Complaint in ARREDSTON09FEB00424).

[99] Defendant's evidentiary submission, at Exhibit 22 (Final Agency Decision in ARREDSTON09FEB00424).

Plaintiff alleges in her amended complaint that defendant retaliated against her for filing three formal complaints of discrimination with the Redstone Arsenal EEO Office, as well as for the filing the union grievance about her involuntary reassignment to the 301 job series in April of 2004.

Title VII prohibits retaliation against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing [thereunder]."  42 U.S.C. § 2000e-3(a).  Plaintiff does not claim to have direct evidence of retaliation.  Therefore, she must prove her retaliation claim by using the familiar *McDonnell Douglas* burden-shifting framework.  *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).

## A.    *Prima Facie* Case

Under the *McDonnell Douglas* framework, a *prima facie* case of retaliation requires a plaintiff to show that:  (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action; and (3) there is a causal connection between her protected activity and the materially adverse action suffered.  *Hurlbert*, 439 F.3d at 1297.  "If the plaintiff makes out a *prima facie* case, the burden then

42

shifts to the defendant to articulate a legitimate reason for the adverse action." *Id.*
"If the defendant does so, the plaintiff must then show that the defendant's proffered
reason for the adverse action is pretextual." *Id.*

There is no dispute that plaintiff engaged in protected activity when she
challenged the Army's decision to reassign her to the GS-301 series,[100] and when she
filed her three formal EEO complaints. Thus, all that remains is for plaintiff to
establish the second and third elements of a *prima facie* retaliation claim.

### 1. Materially adverse action

While the second element of a *prima facie* case, similar to Title VII disparate
treatment claims, requires the plaintiff to show that she suffered an adverse action,
the definition of an adverse action in the retaliation context is different from the
definition in the disparate treatment context. *See Burlington Northern and Santa Fe
Railway Co. v. White*, 548 U.S. 53, 61 (2006). For an employer's conduct to be
"adverse" under the anti-retaliation provision of Title VII, the conduct only must be
conduct that a reasonable person would find materially adverse, meaning conduct that
might deter an employee from reporting discrimination. *Id.* at 68. "[T]rivial harms"
and "petty slights" do not constitute adverse employment actions. *Id.*

---

[100] Plaintiff acknowledges that she has not asserted a separate claim based on her 2004
reassignment. In other words, plaintiff does not assert that the reassignment itself was retaliatory.
Instead, she alleges that her complaints about the 2004 reassignment constitute protected activity
upon which her current claim is based. *See* doc. no. 44 (plaintiff's brief), at 18.

Many of the actions about which plaintiff complained in the complaint filed in this court and identified during the discovery process unquestionably fall into the category of "trivial harms" or "petty slights."[101]   Indeed, plaintiff appears to acknowledge as much, because the only actions she discusses in her brief as adverse employment actions are the allegedly below-grade, undesirable work-assignments and negative performance-evaluations she received.[102]

_____

[101] The most obvious examples of the petty nature of plaintiff's complaints include not being addressed as "*Dr.* Sedlacek," being accused of barricading herself in her cubicle, having junior employees report on the progress of work she was performing for them, being listed last on group e-mails, having her position correctly identified as eligible for early retirement, receiving an inexpensive card in a dirty envelope, not receiving two hours of leave for a luncheon that she did not attend, being spoken to disrespectfully, and receiving 59 minutes off of work on a different day from her co-workers.  Other of her complaints sound slightly more serious but still do not rise to the level of an adverse employment action, even under the less stringent standard applicable to retaliation claims.  For example, plaintiff complains of not being selected as Acting Chief in Corlew's absence, but she provides no evidence, other than her own speculation, that those actions had any effect on her job performance, compensation, or opportunity for future advancement.  She also complains about Corlew confronting her for coming in late to the office, but she offers no evidence that anything ever came of that accusation.  She complains of Corlew's decision not to allow her to change her work schedule, but she cannot dispute that the change she requested would be in violation of her union agreement.

[102] *See* doc. no. 44 (plaintiff's brief), at 21-22.  Plaintiff does include a paragraph in her brief under the heading "**VERA/VSIP, '59 Minutes,' Acting Division Chief, and 'Surveillance' Claims**," stating:

> Luckily Mr. Farrior became her second line supervisor when he did or Corlew's reign of terror would have continued.  Not only did Farrior resolve the leave issue but begain [sic] to be a moderating influence on Corlew.  He directed Corlew to upgrade Plaintiff's performance appraisal even though Corlew would not have unless so directed.  Her 5 years with Corlew would have been worse without Charles Farrior.

*Id.* at 23 (boldface emphasis in original).  This paragraph does not address the VERA/VSIP, 59 minutes, acting Division Chief, and surveillance allegations, and it does not identify any additional adverse employment actions.  Thus, the court must conclude that the only adverse employment

### a.    Performance evaluations

Courts within the Eleventh Circuit have recognized that unfavorable performance-evaluations *may be* adverse employment actions in the retaliation context, but usually only if the negative evaluation is accompanied by a loss of pay. *See, e.g., Rainey v. Holder,* 412 F. App'x. 235, 238 (11th Cir. 2011) ("An unfavorable performance review that affected a plaintiff's eligibility for a merit pay increase constitutes sufficiently adverse action in the retaliation context.") (citing *Crawford v. Carroll,* 529 F.3d 961, 971-72 (11th Cir. 2005)).   On October 30, 2006, plaintiff received an overall rating of "4" out of "5" on her performance evaluation for the 2005-2006 fiscal year: *i.e.,* the next-to-lowest rating.   That rating indicated only "fair" performance, but it is undisputed that the rating was elevated and negative remarks were removed from plaintiff's file after she complained.   There is no evidence that the 2005-06 rating ever affected plaintiff's pay, or any other aspect of her employment.   Consequently, the court cannot consider the 2005-06 performance

---

actions plaintiff continues to allege are the below-grade assignments and the negative performance evaluations.   It is not the court's job to divine potential arguments not advanced or developed by the parties in their briefs. *See U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1287 n.13 (11th Cir. 2007) (refusing to address a party's "perfunctory and underdeveloped argument") (citing *Flanigan's Enterprises, Inc. v. Fulton County*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that "fail[ure] to elaborate or provide any citation of authority in support [of an argument]" results in waiver)). *See also Lyes v. City of Riviera Beach, Fla*., 126 F.3d 1380, 1388 (11th Cir. 1997) (explaining that "the onus is upon the parties to formulate arguments"); *Resolution Trust Corp. v. Dunmar Corp*., 43 F.3d 587, 599 (11th Cir. 1995) ("[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it").

evaluation to be an adverse employment action in the context of a retaliation claim.[103]

Strangely, however, a different conclusion can be reached with regard to plaintiff's 2007-08 evaluation, even though her initial score of "2" was elevated to a "1," the highest possible rating.  As a result of that evaluation, and despite the high overall rating, plaintiff did not receive a cash award or bonus for the 2007-08 year. A reasonable person might be deterred from filing a complaint of discrimination if she knew that, as a result, she would receive a performance evaluation that would later prevent her from receiving a cash award.  Accordingly, construing all the facts in the light most favorable to plaintiff, the 2007-08 performance evaluation can be considered an adverse employment action.

### b.   Work assignments

Plaintiff also alleges that, in retaliation for her complaints of discrimination, Corlew assigned her "insignificant and menial" work that would be better suited for administrative employees well below her grade level.[104]  According to plaintiff, those assignments — including work on *The Advocate*, the Acquisition Center University, the CMR project, and FMS — were a "career ender," because they prevented her

---

[103] To the extent plaintiff also complains that her 2005-06 evaluation was delayed because of her dispute with Corlew over whether she was permitted to have a union representative present during her evaluation, that also is not an adverse employment action with respect to plaintiff's retaliation claim.  Any delay in plaintiff's receipt of her evaluation was minimal, and she suffered no loss of pay or other benefits as a result of the delay.

[104] Doc. no. 44 (plaintiff's brief), at 21.

from gaining the credentials and experience she needed to advance within her organization.[105]   Plaintiff also argues that Corlew denied her the ability to undergo training that would help her gain the skills she needed to perform tasks that would be more suitable for an employee of her grade level.  A reasonable employee might be deterred from filing a complaint of discrimination if she believed that, as a result, she would be assigned only menial tasks that would prevent her from advancing in her career.  Therefore, the unfavorable, below-grade work assignments constituted  an adverse employment action with regard to plaintiff's retaliation claim.

### 2.    Causation

The third element of a *prima facie* retaliation claim, the requirement that there be a causal connection between a plaintiff's protected activity and the adverse acton, only requires the plaintiff to show "that the protected activity and the adverse action were not wholly unrelated."  *Simmons v. Camden County Board of Education*, 757 F.2d 1187, 1189 (11th Cir. 1985).  In showing that the actions were not wholly unrelated, the plaintiff must show that the ultimate decisionmaker, *i.e.*, the person who decided to take the materially adverse action, knew of the protected activity. *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]he plaintiff must generally show that the decision maker was aware of the

---

[105] *Id.* at 21-22.

protected conduct at the time of the adverse employment action."). This requirement exists because, if the decisionmaker did not have knowledge of the protected activity, then the protected activity could not have been the cause of the decisionmaker's actions. *Id.* at 798-99. "The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

If the plaintiff can show that the ultimate decisionmaker knew of the plaintiff's protected activity, the causal connection element may be established in a number of ways. One method of establishing the causal connection element is through a showing of close temporal proximity. *See Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1332, 1337 (11th Cir. 1999) ("We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."). Temporal proximity is considered in relation to the totality of the evidence and, thus, is not defined by a set period of time, but rather is considered in light of the facts of the case. *See Fleming v. Boeing Company*, 120 F.3d 242, 248 (11th Cir. 1997); *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1329 (5th Cir. 1980). Intervening causal events occurring between the protected activity and the adverse

48

action can break any causal inference resulting from temporal proximity evidence. *See Whatley*, 632 F.3d at 1329 (despite evidence of close temporal proximity, the court found that the plaintiff failed to show a causal connection because his discharge was caused by events independent of his protected activity and which occurred between his protected activity and discharge). If the plaintiff attempts to satisfy the causal connection element through the use of temporal proximity evidence *alone*, the temporal proximity between the protected activity and the adverse action must be very close. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("But mere temporal proximity, without more, must be 'very close.'") (quoting *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001)). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not [close] enough." *Id.* (citing *Breeden*, 532 U.S. at 273).

Plaintiffs also may satisfy the causation element, as well as bolster temporal proximity evidence of causation, by presenting other evidence tending to show causation. *See*, *e.g.*, *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir. 1991) ("The pronounced increase in negative reviews and the careful scrutiny of [the plaintiff's] performance, coupled with testimony suggesting that management personnel were acutely aware of [the plaintiff's] EEOC charge, is sufficient to establish a causal link for [the plaintiff's] *prima facie* case of retaliatory discharge.");

49

*Simmons*, 757 F.2d at 1189 (finding evidence that the ultimate decisionmaker made angry remarks about the protected activity was sufficient to establish the causal connection element).  Courts have recognized as forms of such "other evidence" of causation:

> ongoing antagonism by the employer, expression of displeasure about the employee's protected activity from the employer's management, inconsistencies in the employer's explanations for the adverse action, the employer's actions not being in accordance with its regular procedures or policies, the employee being subjected to unusual surveillance after engaging in the protected activity, the employee's uniformly positive performance evaluations preceding protected activity, and dramatically more negative evaluations post protected activity, with little or no change in the employee's performance, and other employees engaging in the same protected activity being subjected to the same or similar adverse actions.

2 Lex K. Larson, *Employment Discrimination* § 35.02 (2d ed. 2011) (footnotes omitted).

### a.    2007-08 performance evaluation

Plaintiff first received her 2007-08 performance evaluation, awarding a score of "2," on October 23, 2008.  Plaintiff does not state the precise date on which Corlew denied her a cash award based on the 2007-08 performance evaluation, but the court presumes it was the same date as the evaluation itself, because the evaluation form has a blank for supervisors to indicate whether the employee will be receiving a cash award.  Plaintiff also does not state the precise date on which Farrior upheld Corlew's

50

decision not to give her a cash award for the 2007-08 year, but the court presumes the decision was made on November 18, 2008, the same date that Farrior changed her rating from a "2" to a "1."

Those dates are far too removed from her 2004 grievance, or even from Corlew's first awareness of that grievance in October or November of 2005, to warrant an inference of causation based solely on temporal proximity. The October and November 2008 dates also are too temporally removed from plaintiff's March 7, 2007 formal complaint of discrimination. *See Thomas*, 506 F.3d at 1364 ("A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough.") (citations omitted). The court can discern no additional evidence of retaliation that is sufficiently compelling to compensate for a minimal year-and-a-half time gap between the protected activity and the allegedly adverse action. Further, plaintiff filed her third formal complaint of discrimination *after* she had already received the score of "2" on her 2007-08 evaluation, and *after* she was denied a cash award based on that evaluation. Therefore, it is not possible to infer that plaintiff's evaluation was in retaliation for her third formal complaint.

Even so, making every possible effort to construe the record in the light most favorable to plaintiff, a reasonable jury could conclude that plaintiff's second formal administrative complaint (filed on October 30, 2008) preceded the decision to deny

her a cash award.  Although plaintiff initially received her 2007-08 performance evaluation on October 23, 2008, the decision to deny her bonus cash award was not finalized until Farrior approved it on November 18, 2008.  The very short time gap of just a few weeks between plaintiff's October 30, 2008 formal administrative complaint and the November 18, 2008 decision to deny her a cash award is sufficient to warrant an inference of causation based on temporal proximity

In summary, plaintiff has established a causal linkage between her October 30, 2008 formal administrative complaint, on the one hand, and her 2007-2008 performance evaluation, and the subsequent denial of a bonus cash award, on the other hand.

b.    **Work assignments**

All of the work assignments about which plaintiff complains were made between October of 2005 and August of 2006.  Before those dates, plaintiff had engaged in only one form of protected activity:  the union grievance she filed as a result of her involuntary reassignment to a GS-301 series position in April of 2004. That grievance was ongoing through January of 2006.  It is undisputed that Corlew was not involved in the decision to reassign plaintiff to the GS-301 series, and that he was not a subject of plaintiff's April 2004 union grievance.  At Corlew's January 21, 2011 deposition, he testified that he did not recall when he became aware of

52

plaintiff's grievance, except that it was "quite a while" after he became plaintiff's supervisor.[106]   However, during the March 11, 2008 administrative hearing on plaintiff's first formal EEO complaint, Corlew testified that Carol Lehman, Corlew's predecessor, had informed him "that she had had problems with [plaintiff] and [plaintiff] had been a problem employee, on giving assignments to."[107]   Lehman also informed Corlew that plaintiff had been reassigned to his Division as a result of the settlement of the grievance she had filed about her male coworker running into her shoulder.   Corlew's testimony does not clearly indicate the date on which Corlew became aware of this information, but it appears to have been at least roughly contemporaneous with Corlew's replacement of Lehman in October of 2005.   In any event, Corlew knew about plaintiff's grievance by November 7, 2005, because, by that date, he was documenting all of his meetings with plaintiff on the advice of MER, with whom he had consulted about how to handle plaintiff's unique employment situation.[108]

Based on Corlew's testimony, it can reasonably be assumed that he was aware of plaintiff's grievance when he made the work assignments of which plaintiff now

---

[106] Corlew Deposition, at 17-19.

[107] March 11, 2008 Transcript, Vol. 2, at 257.   The court notes that plaintiff's counsel incorrectly cited this testimony as being in Volume 1 of the March 11, 2008 Transcript, which is Exhibit 4 to defendant's evidentiary submission, not Volume 2, which is Exhibit 5.

[108] *Id.* at 256-57.

complains.  Furthermore, Corlew made the *The Advocate* and Acquisition Center University assignments within weeks of his start on the job, indicating very close temporal proximity between those assignments and his first awareness of plaintiff's protected activity.  *See Entrekin v. City of Panama City*, 376 F. App'x. 987, 997 (11th Cir. 2010) (finding that plaintiff established a *prima facie* case of retaliation based "solely on the 'very close' proximity between the [plaintiff's] filing of the lawsuit . . . and the termination [of the plaintiff] just over two weeks later.").  Thus, the evidence supports a finding of causation with regard to the *The Advocate* and Acquisition Center University assignments, even without any additional evidence of causation.

Plaintiff received the CMR assignment, at the least, approximately five months after Corlew first learned of her grievance.[109]  The date on which plaintiff received the FMS assignment is unclear from the record, but it was sometime before August 10, 2006, because Corlew reminded her of the assignment on that date.  Thus, at least nine months, and perhaps more like ten months, passed between Corlew's first awareness of plaintiff's grievance and plaintiff's receipt of the FMS assignment.  Five-month and nine-month delays between awareness of the protected activity and

---

[109] The five-month time period assumes that Corlew first knew of the grievance on November 7, 2005.  It is likely, however, that he knew about the grievance from his first day on the job in October of 2005.

subsequent adverse action are not sufficient, standing alone, to support an inference of causation.  *See Thomas*, 506 F.3d at 1364.

Even so, construing the evidence in the light most favorable to plaintiff, the court finds there is sufficient additional evidence to support an inference of causation with regard to the CMR and FMS assignments.  Most troubling is the fact that Corlew referred to plaintiff as a "problem employee," and the fact that he documented plaintiff's actions and complaints more carefully than those of other employees.

In summary, the court finds that there is sufficient evidence in the record to support an inference that plaintiff received unfavorable work assignments in retaliation for engaging in protected activity.  Therefore, she has established a *prima facie* case on her claim for retaliation based on retaliatory work assignments.

## B.    Defendant's Legitimate, Non-Discriminatory Reasons

Defendant offered the following legitimate, non-discriminatory reasons for plaintiff's work assignments:

> The Army assigned Plaintiff work that was commensurate with her job series and with her skills, abilities and certifications.  Corlew testified that his Division did not have any Program Management functions and that the bulk of the work in his Division was within the GS-1102 (Contracting Series) job series. . . .  Further, the GS-1102 work performed by his Division was high level work requiring Department of Defense Contracting certification at Levels II and III. . . .  Plaintiff acknowledges that she is a GS-301, not a GS-1102, and that GS-1102 positions require Contracting certification. . . .  Plaintiff admits that she

does not have Contracting certification at any level. . . .  Plaintiff also admits that Corlew told her that the reason why he could not assign her GS-1102 work was because she was not a GS-1102 and because she lacked Contracting certification. . . .[110]

Defendant also offered legitimate, non-discriminatory reasons for some of the other allegedly retaliatory actions discussed by plaintiff.  Although the court has found that plaintiff cannot establish a *prima facie* case of retaliation based on those actions, the court will nonetheless discuss defendant's proffered legitimate reasons for those actions, for the sake of completeness.  With regard to Corlew's failure to designate plaintiff Acting Chief in his absence, defendant states that plaintiff was not chosen because she was not the most qualified due to her lack of Contracting certification.  With regard to plaintiff's request to change her work schedule to have Mondays off, defendant states that plaintiff's request was denied because the applicable collective bargaining agreement did not permit plaintiff to work that schedule.  With regard to plaintiff's requests for training, defendant states that Corlew denied her request to attend the Defense Acquisition Workshop in February of 2006 and the World Congress in April of 2006 due to lack of funding.  He denied her request to attend the Advanced Validation Course in August of 2006 because that course was geared toward supervisors, and plaintiff was not a supervisor.  Finally, he

---

[110] Doc. no. 31 (defendant's brief), at 31-32 (citations to the statement of facts omitted).

denied plaintiff's requests to attend computer training courses, because comparable, free courses were available online.

Furthermore, the record reflects that plaintiff was informed that Farrior upheld Corlew's decision to deny her a cash award as a result of her 2007-2008 performance evaluation because he saw no compelling reason to override that decision.  Corlew denied the award as an exercise of his supervisory discretion, because he determined that plaintiff's performance did not warrant receipt of an award.

All of these reasons are legitimate, non-retaliatory grounds for defendant's employment decisions.  The burden now shifts to plaintiff to establish that defendant's proffered legitimate reasons are actually a mere pretext for retaliation.

## C.    Pretext

The plaintiff's burden at the pretext stage is that of "cast[ing] sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct' . . . ." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 135 (2000) ("[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier

of fact to conclude that the employer unlawfully discriminated.").  The plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (*en banc*) (internal quotation marks omitted).

The court will address each of plaintiff's pretext arguments in turn.  First, plaintiff asserts that "Corlew[']s explanation of the reason he denied Plaintiff the change in her work schedule is preposterous."[111]  Plaintiff's mere disagreement with defendant's proffered reasons is insufficient to establish pretext.  *See, e.g.*, *Young v. General Foods Corp.*, 840 F.2d 825, 830 (11th Cir. 1988) ("Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination.").  Furthermore, the court can discern no evidence to support plaintiff's characterization of Corlew's decision as "preposterous."  The record amply supports Corlew's testimony that the applicable collective bargaining agreement did not permit him to grant plaintiff's request.

Plaintiff also asserts that Corlew lied about being told that plaintiff was a

---

[111] Doc. no. 44 (plaintiff's brief), at 25.

trouble maker.[112]  During the March 11, 2008 administrative hearing on plaintiff's first EEO complaint, Corlew testified that his predecessor, Carol Lehman had told him that plaintiff was a "problem employee," in that it was difficult to assign work to her.  Based on that information, Corlew consulted MER, which advised him to keep a chronological file of all of his interactions with plaintiff, and to avoid having any closed door conversations with her without another female present.[113] Subsequently, during Corlew's January 21, 2011 deposition, he testified that he began documenting his interactions with plaintiff — not because someone had told him to — but because of his observations of plaintiff when he first met with her.[114]  Those two statements, made three years apart, admittedly are inconsistent with regard to Corlew's reasons for documenting plaintiff's behavior.  Even so, there is no inconsistency with regard to the "problem employee" or "troublemaker" characterizations.  Corlew did not address either of those characterizations in his deposition, and more specifically, he did not state in his deposition whether he was told by someone else that plaintiff was a "troublemaker," or whether he came to that conclusion on his own.  Furthermore, the reason behind Corlew's decision to document his interactions with plaintiff has nothing to do with her qualification to

---

[112] *Id.*

[113] Transcript of March 11, 2008 Hearing, Vol. 2, at 257.

[114] Corlew Deposition, at 124.

59

serve as Acting Chief, her request to change her work schedule, or her requests for training.  In short, the reason why Corlew began documenting plaintiff simply is not material to any of plaintiff's claims.

Next, plaintiff sates that "Corlew lied about working Plaintiff outside her GS-13 Grade and even claimed her to be disrespectful toward him for even raising the issue."[115]  The only evidence plaintiff cites to support that argument is Corlew's deposition testimony that he did not work plaintiff outside her grade.  Plaintiff and Corlew may disagree about whether plaintiff's work assignments were appropriate for someone of her grade level, but that disagreement does not establish that Corlew was lying, and it does not call into question any of defendant's proffered legitimate, non-retaliatory reasons.

Plaintiff also states, "Corlew expansively testifies about Plaintiff being disrespectful even if she exercises her rights," "Corlew finds Plaintiff ever disrespectful for questioning the manner in which management addresses training," and "Corlew further describes his view of respect and testifies that he does not have to investigate; he may assume facts."[116]  Again, plaintiff and Corlew may disagree about whether some of plaintiff's complaints "crossed the line" from being proper

---

[115] Doc. no. 44 (plaintiff's brief), at 25.

[116] *Id.*

60

exercises of her rights to being disrespectful of those in authority over her, but that disagreement does not establish that Corlew was wrong.  Furthermore, it has nothing to do with any of defendant's proffered legitimate, non-discriminatory reasons.  If anything, if Corlew formed the opinion that plaintiff was being disrespectful, that would be a legitimate, non-retaliatory reason to take action against her.

Plaintiff also states that "Corlew contradicts himself when he say's [sic] he doesn't recall Plaintiff asking to use the title of Doctor in Correspondence, not social intercourse."[117]  The portion of the record to which plaintiff cites to support that argument contains only Corlew's deposition testimony that he did not recall whether plaintiff asked him to call her "Doctor" in personal conversation, or just in correspondence that went outside their division.[118]  Corlew's testimony that he does not recall the context of plaintiff's request does not establish any contradiction; it simply establishes that, at the time of his deposition, Corlew did not recall either way.  Furthermore, and importantly, even if Corlew had contradicted himself about the context in which plaintiff asked to be called "Doctor," that would do nothing to discredit any of defendant's proffered legitimate, non-retaliatory reasons.

Finally, plaintiff states that "Corlew reinterates [sic] to upper management his

---

[117] *Id.*

[118] *See* Corlew Deposition, at 147.

extreme view to Col. Kallam and is given the order to 'Drive on,'" and "Corlew tells his boss Kallan [sic] that he will stay the course and then attempts to explain that it was not a conversation about removing her from federal service."[119]   Plaintiff is referring to an e-mail Corlew sent to Colonel Kallam on August 15, 2006, stating:

> I apologize for your being bothered by Carol on this but she "goes all out" and doesn't care who she insults or aggravates.  She tried to involve Rex Conners and Charles Urban in this as well.  As I proceed to work with MER on her "Letter of Admonishment," I expect it will get worse.  She knows that she is being held accountable and will react.  I will "stay the course" by providing my documentation to MER and keeping good records of her refusals, attacks and abuses.[120]

Colonel Kallam responded, "Drive-on."[121]   In his deposition, Corlew denied plaintiff's counsel's suggestions that his comments about "staying the course" meant he was attempting to remove plaintiff from federal service.  Instead, Corlew explained that he meant he would continue to administer appropriate guidance or discipline to plaintiff even though she might complain, and that he would be responsible to appropriately document any discussions had or actions taken.[122]   Corlew's attempts to explain his actions to his second-level supervisor were not wrongful, and they do not call into question any of defendant's proffered legitimate, non-retaliatory reasons.

---

[119] Doc. no. 44 (plaintiff's brief), at 25-26.

[120] Corlew Deposition, at Exhibit 17.

[121] *Id.*

[122] Corlew Deposition, at 153-60.

The court also notes that plaintiff did not make any pretext arguments with regard to defendant's proffered legitimate, non-discriminatory reasons for its decision to deny her a cash award after her 2007-08 performance appraisal. She offers nothing to call into question defendant's explanation that Corlew denied the award in his discretion because he did not think plaintiff deserved it, and that Farrior upheld that decision because he could discern no compelling reason to override Corlew's decision.

In summary, plaintiff's attempts to establish pretext amount to nothing more than disagreements with defendant's actions or general attacks on Corlew's credibility. Plaintiff has not identified any evidence that casts doubt upon defendant's proffered legitimate, non-retaliatory reasons for its actions. Accordingly, plaintiff has not satisfied her burden under the *McDonnell-Douglas* burden-shifting framework, and she cannot prevail on her Title VII retaliation claim.

### D.   Hostile Work Environment

To the extent that plaintiff has asserted a claim for a retaliatory hostile work environment that is separate and distinct from her retaliatory disparate treatment claim,[123] defendant argues that the claim is due to be dismissed because it has not

---

[123] It is questionable whether plaintiff actually asserted a separate claim for retaliatory hostile work environment in her amended complaint. In the fact section of her complaint, she does state that

been recognized by the Eleventh Circuit.  Alternatively, defendant argues that summary judgment is due to be granted on that claim because plaintiff cannot establish all of the required elements.

Defendant is correct that the Eleventh Circuit has not explicitly recognized a separate claim for a "retaliatory hostile work environment."  *See Ekokotu v. Federal Express Corp.,* 408 F. App'x. 331, 339 (11th Cir. 2011) ("As for Ekokotu's retaliatory hostile work environment claim, we have not addressed in a published opinion the cognizability of a retaliatory hostile work environment claim under Title VII."); *Andrews-Willmann v. Paulson,* 287 F. App'x. 741, 746 n.4 (11th Cir. 2008) ("Further, there are threshold questions [about] whether a plaintiff can even bring a 'retaliatory harassment claim' and, if so, whether the kind of harassment Andrews-Willmann alleges can constitute an actionable adverse employment action.").  Importantly, however, the Eleventh Circuit also has not explicitly rejected such a claim, and several other circuits have recognized it.  *See, e.g., Valle-Arce v.*

---

"Corlew's almost daily reprisals upon Dr. Sedlacek negatively affected the conditions of her employment . . . ."  Amended Complaint, at ¶ 14.  That language is similar to what might be used to allege a hostile work environment claim, but in her actual count for retaliation, plaintiff states only that "[t]he adverse treatment endured by Dr. Sedlacek because of her participation in the protected activity of protesting discriminatory employment practices constitutes discriminatory retaliation [in] violation of Title VII," and that, "[a]s a result of this retaliation, Dr. Sedlacek has suffered acute economic harm and emotional distress." *Id.* at ¶ 16.  Those allegations sound more like a retaliatory disparate treatment claim than a retaliatory hostile work environment claim.  Nonetheless, because both parties seem to view plaintiff's amended complaint as asserting a hostile work environment claim, the court will analyze it.

*Puerto Rico Ports Authority,* 651 F.3d 190, 198-99 (1st Cir. 2011); *Hussain v. Nicholson,* 435 F.3d 359, 266 (D.C. Cir. 2006) ("In this circuit, a hostile work environment can amount to retaliation under Title VII.") (citing *Singletary v. District of Columbia,* 351 F.3d 519, 526 (D.C. Cir. 2003)).  *See also Fallon v. Potter,* 277 F. App'x. 422 (5th Cir. 2008); *Lujan v. Johanns,* 181 F. App'x. 735, 737 (10th Cir. 2006).  For the sake of completeness, then, this court will assume that the claim is viable and proceed to analyze it on its merits.

As one district court has noted, absent a ruling from the Eleventh Circuit, "there is little guidance as to how to evaluate such a claim."  *Anderson v. Dunbar Armored, Inc.,* 678 F. Supp. 2d 1280, 1320 n.7 (N.D. Ga. 2009).  Even so, a review of case law from within and outside this Circuit reveals that most courts addressing retaliatory hostile work environment claims employ the *McDonnell-Douglas* burden-shifting framework.  *See, e.g., Kavanaugh v. Miami-Dade County,* 775 F. Supp. 2d 1361, 1368-69 (S.D. Fla. 2011) (analyzing the plaintiff's retaliatory hostile work environment claim under the *McDonnell-Douglas* framework); *Anderson,* 678 F. Supp. 2d at 1320 n.7 ("[I]t appears that a retaliatory harassment claim in the Eleventh Circuit should be analyzed under the *McDonnell Douglas* framework.").  The *prima facie* case is the same as for any other claim of retaliation, with the plaintiff being required to prove that she engaged in statutorily protected activity, suffered a

materially adverse employment action, and there is a causal connection between her protected activity and the materially adverse action. *See Valle-Arce,* 651 F.3d at 198-99 (reciting the elements of the *prima facie* case for retaliation); *Fallon,* 277 F. App'x. 422 (same); *Lujan,* 181 F. App'x. at 737 (same). The adverse employment action element can be proven by considering the cumulative effect of all offensive incidents constituting a hostile work environment. *See Valle-Arce,* 651 F.3d at 198-99 ("While termination of employment obviously is an adverse employment action, an environment of hostility and harassment may also suffice if it 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (citing *Burlington,* 548 U.S. at 68) (other citations omitted); *Lewis v. U.S. Dept. of Labor, Administrative Review Bd.*, 368 F. App'x. 20, 30 (11th Cir. 2010) ("Although we have not explicitly recognized a retaliation claim based on a hostile work environment, other circuits have held that subjecting an employee to a hostile work environment in retaliation for engaging in protected activity constitutes adverse employment action.") (footnote citations omitted); *Kavanaugh,* 775 F. Supp. 2d at 1368-69 ("Although the Eleventh Circuit has not explicitly recognized a retaliation claim based on a hostile work environment, other Circuits have held that a hostile work environment resulting from retaliation for engaging in a protected activity does constitute adverse employment action.") (citation omitted).

66

As with any hostile work environment claim, the plaintiff must establish that the retaliatory treatment was sufficiently severe and pervasive to alter the terms and conditions of her employment. *See Baird v. Botbaum,* 662 F.3d 1246, 1250 (D.C. Cir. 2011) ("We have previously found that 'a hostile work environment can amount to retaliation under Title VII' if the conduct meets [the 'severe and pervasive'] standard."); *Gomez-Perez v. Potter,* No. 10-2348, 2011 WL 6445569, at *5 (1st Cir. Dec. 22, 2011) (slip copy) ("'[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment.' However, to amount to a hostile work environment, the alleged harassment must be 'severe or pervasive.'") (citations omitted) (bracketed alterations added); *Ekokotu,* 408 F. App'x. at 339 ("As for Ekokotu's retaliatory hostile work environment claim, we have not addressed in a published opinion the cognizability of a retaliatory hostile work environment claim under Title VII. However, the Supreme Court has said that a claim for a hostile work environment, like other types of harassment, still requires proof of harassing acts so severe or pervasive that they altered the terms and conditions of employment.") (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993)); *Hussain,* 435 F.3d at 366 (holding that, to prevail on a claim for retaliatory hostile work environment, a plaintiff "must show that the [employer] subjected him to 'discriminatory intimidation, ridicule, and insult' of such

67

'sever[ity] and pervasive[ness] [as] to alter the conditions of [his] employment and create an abusive working environment.'" (bracketed alterations in original, citations omitted); *Kavanaugh,* 775 F. Supp. 2d at 1369 ("[J]ust as with other types of harassment, a hostile work environment claim requires a plaintiff to prove that the harassing acts were sufficiently severe or pervasive to alter the terms and conditions of employment.") (citations omitted); *Tucker v. Bentler Automotive AL, Inc.,* No. 3:07cv298-WHA, 2009 WL 531875, at *13 (M.D. Ala. March 3, 2009) (slip copy) ("This court has confronted this issue in the past and was satisfied that if such a claim [for retaliatory harassment] is recognized, the harassment, to constitute an adverse employment action, must be sufficiently severe and pervasive to alter a term or condition of employment.") (citing *Perryman v. West,* 949 F. Supp. 815 (M.D. Ala. 1996)); *Grier v. Snow,* No. 1:04-CV-397-JTC, 2006 WL 5440387, at *2 (N.D. Ga. March 15, 2006) ("Generally, courts analyzing retaliatory harassment claims use the same standard as that used to determine whether an employee has experienced a hostile work environment. . . .  In the Eleventh Circuit, the 'severe and pervasive' standard is applicable.").

As the Northen District of Georgia stated in *Bozeman v. Per-Se Technologies, Inc.,* 456 F. Supp. 2d 1282 (N.D. Ga. 2006),

"An employee's decision to report discriminatory behavior cannot

immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern*, --- U.S. ----, ---- - ----, 126 S. Ct. 2405, 2414-15, 165 L. Ed.2d 345 (citing 1 B. Lindemann & P. Grossman, *Employment Discrimination Law* 669 (3d ed.1996)) (stating "courts have held that personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers" are not actionable under § 704(a)). A claim for retaliatory harassment, like other types of harassment, still requires proof of harassing acts so severe or pervasive that they altered the terms and conditions of the Plaintiff's employment. *Id.*; *see generally Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed.2d 295 (1993) (internal citations and quotation marks omitted); [*Gupta v. Florida Bd. of Regents,* 212 F.3d 571 (11th Cir. 2000)]. Requiring a plaintiff to prove that the harassment was severe and pervasive ensures that Title VII does not become a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed.2d 662 (1998).

*Bozeman,* 456 F. Supp. 2d at 1345.[124]  In order to ensure that the plaintiff satisfies that threshold standard, the court should consider, as in any other hostile work environment claim, "the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance." *Tucker,* 2009 WL 531875, at * 14 (citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)).

---

[124] The court presumes that, if a plaintiff establishes a *prima facie* case of retaliation based upon harassment, the next step would be to consider any legitimate, non-discriminatory reasons for the actions taken, and whether plaintiff can establish pretext. However, the court could find no case explicitly so stating, because in most of the cases reviewed by the court, the plaintiff failed to establish that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.

As discussed earlier in this opinion, most of the incidents complained of by plaintiff — including not being addressed as "Dr. Sedlacek," being accused of barricading herself in her cubicle, having junior employees report on the progress of work she was performing for them, being listed last on group e-mails, having her position *correctly* identified as eligible for early retirement, receiving an inexpensive card in a dirty envelope, not receiving two hours of leave for a luncheon that she did not attend, being spoken to disrespectfully, and receiving 59 minutes off of work on a different day from her co-workers — fall into the category of "trivial harms" or "petty slights" that employees in the American workplace are expected to endure without complaint.  To hold otherwise would transform the anti-discrimination laws into a "general civility code."[125]

That leaves the following incidents: work assignments to *The Advocate*, Acquisition Center University, CMR, and FMS; denials of Defense Acquisition Executive Overview, World Congress, Civilian Education System Advanced Validation, and computer program training; the results of plaintiff's 2005-2006 performance evaluation and Corlew's refusal to allow plaintiff to have a union representative present during the evaluation; Corlew's accusation that plaintiff was late to work; Corlew's denial of plaintiff's request to change her work schedule;

---

[125] The court is considering the combined effect of all of the incidents, even those that are not, themselves, adverse employment actions.

Corlew's refusal to designate plaintiff as Acting Chief during his absences on March 28 and October 23, 2006; and plaintiff's 2007-2008 performance evaluation and denial of bonus. Thirteen of those incidents — all except the 2007-2008 performance evaluation and denial of bonus— occurred between late October of 2005 and early December of 2006. The 2007-2008 performance evaluation did not occur until late October/early November of 2008. If the court considers the entire time period addressed by plaintiff, there were fourteen incidents over approximately three years. Although "there is no magic number for frequency," the relevant case law indicates that fourteen incidents over the span of three years should not be considered "pervasive." *Lawrence v. Wal-Mart Stores, Inc.,* 236 F. Supp. 2d 1314, 1325 (M.D. Fla. 2002) (citing *Miller,* 277 F.3d at 1275). *See also Mitchell v. Pope,* 189 F. App'x. 911, 913-14 (11th Cir. 2006) (holding that sixteen incidents over a four-year period were insufficiently frequent). If the court considers only the thirteen incidents occurring between late October of 2005 and early December of 2006, there was approximately one incident per month. That level of frequency falls somewhere in the middle ground between what typically is and is not considered to be "pervasive." *Compare Miller,* 277 F.3d at 1276 (holding that verbal ethnic slurs uttered by a co-employee "three to four times a day," throughout the approximately one-month period plaintiff worked with the employee, were sufficiently frequent) *and Johnson v.*

71

*Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000) (holding that "roughly fifteen separate instances of harassment over the course of four months" was sufficiently frequent) *with Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1248-49 (11th Cir. 1999) (holding that four incidents over an eleven-month period were insufficiently frequent)*, Shepherd v. Comptroller of Public Accounts of Texas,* 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that *several* incidents over a two-year period were insufficient), *and Baskerville v. Culligan International Co.,* 50 F.3d 428, 430 (7th Cir. 1995) (holding that nine instances of offensive behavior over seven months were insufficient).

Some of the remaining incidents — including the work assignments, negative performance evaluations, and resulting denial of bonus — could reasonably be considered "severe," but there is no evidence of any physically threatening or humiliating behavior. After Corlew accused plaintiff of being late to work, plaintiff reported to her union representatives that she was afraid of Corlew. Even so, there is no evidence that Corlew actually engaged in any threatening behavior, and plaintiff's statements about being afraid of Corlew could just as reasonably be construed to mean that she was afraid of what Corlew might do to her career, not what he would do to her person.

Finally, there is no evidence that any of the remaining incidents unreasonably

interfered with plaintiff's job performance. *See Lawrence,* 236 F. Supp. 2d at 1326 ("To show alteration of job performance, a plaintiff need not show tangible effects such as economic harm. However, the plaintiff must show some *material* alteration of job performance from a reasonable person's standpoint.") (internal citations omitted) (emphasis supplied). Plaintiff speculates that the work assignments Corlew gave her and his refusal to select her as Acting Chief in his absence could have prevented her from advancing to supervisory positions in the future, but there is no evidence that Corlew's actions actually had any such effect. There also is no evidence that plaintiff was disciplined after Corlew confronted her for coming in late, or that anything else ever came out of that accusation. Although plaintiff complains of being denied permission to attend training courses, there is no evidence that the lack of training had any tangible effect on plaintiff's employment. Specifically, there is no evidence that any of the courses that were denied would have enabled plaintiff to obtain a higher level of Contracting certification, or would have otherwise rendered her more qualified for the tasks typically performed by the Analysis and Support Division. Further, the record reflects that plaintiff did receive other training during her time under Corlew's supervision. Finally, while Corlew's denial of plaintiff's request to change her work schedule may have made plaintiff unhappy, there is no evidence that plaintiff's performance suffered as a result. To the contrary, and in

73

spite of all of the incidents plaintiff has complained about, it is undisputed that her performance rating increased from a 4 (the next-to-lowest score) in 2006 to a 2 (the next-to-highest score) in 2008, and that her 2008 score was even elevated to a 1 (the highest score) after she complained.  Thus, if anything, plaintiff's job performance seems to have *improved* since 2006.

It must also be noted that the court has already found there to be legitimate, non-retaliatory reasons for many of the allegedly hostile retaliatory actions asserted by plaintiff, including plaintiff's work assignments, the Acting Chief designations, the denial of plaintiff's request to change her schedule, the denial of some of plaintiff's requests for training, and the decision not to give plaintiff a cash award as a result of her 2007-2008 performance evaluation.  Courts have cautioned that only incidents which bear some causal connection to protected activity should be considered in the retaliatory hostile work environment analysis.  *See, e.g., Andrews-Willmann*, 287 F. App'x. at 746-47 (considering only the incidents that had some causal connection to plaintiff's protected activity); *Stokes v. Alfa Mutual Insurance Co.*, No. 2:10cv512–MHT, 2011 WL 5434245, at *4 (M.D. Ala. Nov. 9, 2011) ("First, to establish a *prima-facie* case of retaliation, a plaintiff must show that 'there was a causal connection between the protected activity and the adverse action.' *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).  Therefore, when

assessing whether the cumulative impact of Alfa's various wrongs constitutes unlawful retaliation, the court can consider only those actions motivated, at least in part, by retaliatory animus.  Plaintiffs would otherwise be able to circumvent the causation requirement simply by alleging multiple, isolated instances of mistreatment untethered from any protected activity and then asking the court to consider them in the aggregate.").  The court is not certain whether this requirement operates more like the "causal connection" element of a *prima facie* case of retaliation, the "based on sex/race" element of the *prima facie* case for sex- or race-based harassment,[126] or the second step of the *McDonnell-Douglas* burden-shifting framework, which allows a defendant to present legitimate, non-discriminatory reasons for its actions.  In any event, the establishment of legitimate, non-discriminatory reasons for certain actions taken by the employer certainly indicates the lack of a causal connection between those actions and any protected activity on the part of the plaintiff.

In summary, considering the totality of all the evidence, the court concludes that plaintiff has not established the existence of a severe and pervasive retaliatory hostile work environment that altered the terms and conditions of her employment.  Therefore, summary judgment is due to be granted on her retaliatory hostile work

---

[126] *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) (holding that a plaintiff alleging a sex-based hostile work environment claim must establish, among other elements, that the harassment was based upon her sex).

environment claim, to the extent such a claim actually was asserted in plaintiff's amended complaint.

## IV. CONCLUSION AND ORDER

In accordance with the foregoing, defendant's motion to dismiss plaintiff's retaliatory hostile work environment claim is DENIED, but defendant's alternative motion for summary judgment is GRANTED.  It is ORDERED that all claims asserted by plaintiff are DISMISSED with prejudice.  Costs are taxed to plaintiff. The Clerk is directed to close this file.

DONE this 30th day of March, 2012.

_____
United States District Judge